IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| TODD SCHRIER, | CV 23-60-H-DWM |
| Plaintiff, | |
| vs. | ORDER |
| JIM SALMONSEN, et al., | |
| Defendants. | |

Pending before the Court are Plaintiff Todd Schrier's motions to compel and
for summary judgment, and Defendants' joint motion for summary judgment.  The
motion to compel is denied. (Doc. 68.) Plaintiff's motion for summary judgment is
also denied. (Doc. 49.) Defendants' motion for summary judgment is granted in
par  and denied in part. (Doc. 61.)

## I.  GENERAL BACKGROUND[1]

Plaintiff Todd Schrier is an inmate at Montana State Prison. In late 2021, he
agreed to be weaned off a medication, Lorazepam, that he had been taking for

---

[1] This brief recitation of the facts is supplemented in the analysis. The facts stated
in this section are not disputed.

1

some time prior to entering prison. (Doc. 2 at 7.) The medication is habit-forming, so he had to taper his use until he stopped taking it altogether. Shortly after forming this plan, Schrier was transferred to Crossroads Correctional Center, in Shelby, Montana. He received smaller weaning doses at Crossroads than he expected. *Id.* About five months later, he was transferred back to Montana State Prison. Schrier alleges in his Complaint that he suffered mental and physical illnesses related to withdrawal from the medication and his treatment at Crossroads.

Schrier signed his Complaint for filing on July 13, 2023. He names Montana State Defendants Jim Salmonsen, Warden of Montana State Prison, and Shelly Steyh, Head of Mental Health at Montana State Prison, and Crossroads Defendants Warden Bludworth and Dr. Molnar.[2] (Doc. 2 at 5–6.) His Complaint asserts two claims: a § 1983 claim for unconstitutional denial of medical care under the Eighth Amendment and a violation of the Americans with Disabilities Act related to his mental health issues. (*Id.* at 3.) He seeks damages and injunctive relief in the form of federal investigation of Defendants' mental health programs. (*Id.* at 12.)

## II. MOTION TO COMPEL

Schrier filed a document that has been construed as a motion to compel the

---

[2] Schrier named another defendant, Blausd, who was never served and thus is not a party to this case.

production of documents. (Doc. 68.) In it, he claims to have requested copies of his kites from his time at Crossroads, but he believes Defendants destroyed them to avoid producing evidence.

The State Defendants respond with three points. First, State Defendants have provided Schrier with his Montana State Prison file, including all his grievances. (Doc. 69 at 1.) Second, Schrier has failed to confer with Defendants about these missing documents, as required by Local Rule 26.3(c). (*Id.* at 2.) Finally, Schrier's motion was filed after the motions deadline had passed. (*Id.*)

The Crossroads Defendants similarly emphasize that Schrier did not confer with them before filing his motion, and that it should be denied on that ground alone. (Doc. 72 at 2.) Crossroads Defendants claim to have had no communication from Schrier after they served their discovery responses. (*Id.* at 3.) Crossroads Defendants further assert that they have produced all the grievances they possess, and that they do not retain "kites," which are informal requests that are different from the grievances they do keep and have produced. (*Id.* at 4.) Crossroads Defendants' final argument is that Schrier previously told them that he possesses a "hard copy" of his "kites, grievances, and informals." (*Id.*)

Defendants all claim not to have the documents that Schrier seeks and to have provided what they do have. The Local Rule is declarative: "The court will deny any discovery motion unless the parties have conferred . . . ." D. Mont. L.R.

3

26.3(c). Though pro se filings are usually liberally construed, in this case, a discussion between the parties may have resolved this issue without Court involvement; both groups of Defendants are not refusing to provide something they have, but rather, claiming they have nothing further to disclose. Schrier's reply states that he filed kites every day at Crossroads, dozens of them, complaining about his treatment. (Doc. 74.) As far as Schrier's claim that documents have been destroyed, he has no evidence for that assertion. And though Crossroads Defendants do not have his kites, many of his concerns and beliefs show up in the medical records, in notes from staff about his requests for treatment. Defendants will not be compelled to produce evidence they do not have. Schrier's motion to compel is denied.

### III. MOTIONS FOR SUMMARY JUDGMENT

Schrier and all Defendants, in a joint motion, seek summary judgment. (Docs. 49 and 61.) Both motions are fully briefed, though Schrier did not file a Statement of Undisputed Facts in support of his.

Schrier's motion asserts that the professionals treating him were not medically qualified and they failed to follow the plan to wean him properly from his drugs (forcing him to go cold turkey); Defendants lied about the treatment he received; the wardens failed to train or properly supervise their employees; and that giving him anti-cholesterol medication instead of his Lorazepam is deliberate

4

indifference to his serious medical need. (Doc. 49.)

In support of his motion, he has submitted Defendant Molnar's nursing license, a radiology report of an x-ray he had taken in January, 2022, and discovery responses from both sets of Defendants. (Doc. 49-1.) Schrier did not submit a Statement of Undisputed Facts, but these exhibits appear to be intended as the evidence in support of his motion. He later filed a Statement of Disputed Facts in response to Defendants' motion, and a supplement. (Docs. 71 and 73.)

Both sets of Defendants filed a joint response brief to Plaintiff's motion and in support of their own cross-motion for summary judgment. (Doc. 53.) Their brief is supported by a Statement of Facts, and by Affidavits of Paul Rees, Billie Reich, Jim Salmonsen, Peter Molnar, and Pete Bludworth. (Docs. 54–59.)

Defendants claim they are entitled to summary judgment for eight reasons. (Doc. 53.) First, the undisputed facts establish that Schrier did not receive deliberately indifferent medical care. Second, no supervisory liability can be established for Wardens Salmonsen and Bludworth, or Defendant Steyh. Third, Crossroads Defendants are entitled to summary judgment based on the defense of good faith. Fourth, Schrier's official capacity claim against State Defendants is barred by the Eleventh Amendment. Fifth, State Defendants are entitled to qualified immunity. Sixth, Schrier did not exhaust his administrative remedies. Seventh, Schrier's ADA claim fails because the ADA does not provide a cause of

action against prison facilities. Finally, Schrier's motion is procedurally deficient because there is no dispute of material fact. (Doc. 53 at 5–6.)

## A. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(a) entitles a party to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The movant bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the moving party has satisfied its burden, the non-moving party must go beyond the pleadings and designate by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Id*. The evidence is viewed in the light most favorable to the nonmoving party and all justifiable inferences drawn in the non-moving party's favor. *Id*. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

## B. Analysis

6

### 1. Medical Care

Lack of medical care in a prison context may give rise to an Eighth Amendment claim. A prisoner must allege that a defendant's "acts or omissions [were] sufficiently harmful to evidence a deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Toussaint v. McCarthy*, 801 F.2d 1080, 1111 (9th Cir. 1986). The Ninth Circuit employs a two-prong test for deliberate indifference to medical needs. A plaintiff first must show "a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). A plaintiff then must show "the defendant's response to the need was deliberately indifferent." *Id.*

Deliberate indifference is a "high legal standard," *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004), and requires a showing of "a purposeful act or failure to respond to a prisoner's pain or possible medical need and . . . harm caused by the indifference," *Wilhelm,* 680 F.3d at1122. Such indifference may manifest in two ways. "It may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988) (citing *Estelle*, 429 U.S. at 104-05). A showing of

medical malpractice, negligence, or even gross negligence is insufficient to establish a constitutional violation of the Eighth Amendment. *Estelle*, 429 U.S. at 104-05. A difference of opinion is also insufficient, as a matter of law, to establish deliberate indifference. *See Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

Schrier and Defendants focus on different aspects of Schrier's treatment, leading Defendants to characterize Schrier's claims as merely a difference of opinion. The impetus of Schrier's allegations, though unsupported by any evidence, is found in the allegations of his Complaint. (Docs. 2 at 7-12; 2-1.) Schrier alleges that he was cut off cold turkey from Lorazepam. He explains that he was locked in solitary confinement for three months, during which time staff at Crossroads fed gas into his cell in an attempt to kill him. He overheard staff at Shelby saying they were waiting for him to die. He had to drink water from his toilet, and his food was poisoned. (*See* Doc. 2; Doc. 2-1.) Thus, though his specific medical care claim may be that he was not properly tapered from Lorazepam, the ensuing events are what seem to have motivated his constant grievances and complaints. Schrier's further interactions with staff since his return to Montana State Prison reflect his belief that these events occurred at Crossroads, and that they were a reason for his ongoing health issues. For example, several of his requests for mental or medical help refer to the "torture" he experienced at

8

Crossroads, and the gas and the poisoning. (*See, e.g.*, Doc. 55-1 at 132, 133, 143, 144, 148, 149, 154, and 161.) Schrier has not established by evidence that these things occurred, far from it, but it is established, through his medical records at Crossroads, that he was hallucinating to the point that he thought these things were occurring, for days.

Defendants provide a thousand pages of medical records and the Affidavit of Dr. Paul Rees to rebut Schrier's claims and explain how regularly Schrier has been seen at Montana State Prison and Crossroads. And the record persuades that Schrier has had frequent and consistent medical care since he arrived at Montana State Prison in 2021. However, the question of whether Crossroads too abruptly stopped Schrier's Lorazepam and then watched him endure weeks of hallucinations and suffering as a result is not answered on this record.

Rees' affidavit explains the way Schrier's medication was tapered from November 7, 2021, until he was transferred to Crossroads on December 7, 2021. Schrier appeared to be doing fine during this period. (Doc. 55 at 6.) Schrier was transferred "with his active prescriptions," but without any actual medicine. (*Id.* at 7.) Thus, administration of his titration doses of Lorazepam fell to Crossroads. Rees' affidavit states, without documentary citation, that Montana State Prison and Crossroads discussed a medically appropriate plan, and that Crossroads intended to continue to taper him through January 2, 2022; i.e., for another three-and-a-half

weeks. (*Id.*) Dr. Rees' affidavit says that was the plan but does not explain that that was what happened.

Rees' discussion of Schrier's time at Crossroads is brief. He explains that time in three paragraphs, saying that many professionals attended to Schrier, he had 71 visits or "check-ins," and Schrier refused to take his medications or see medical staff on occasion. (Doc. 55.) The remaining five pages of Rees' affidavit discuss Schrier's care once he was back at Montana State Prison.

Schrier disputes that the taper plan that was formed at Montana State Prison was the plan that was carried out once he got to Crossroads and points out that Rees' conclusions are not supported by references to the records. (Doc. 71 at 2.) Defendants also submitted the affidavit of Peter Molnar, who is an advanced practice registered nurse at Crossroads (and not a doctor, as he was identified in Schrier's Complaint). (Doc. 58.) Molnar was involved with Schrier's treatment at Crossroads, and his affidavit discusses Schrier's access to Lorazepam at Crossroads. It does not independently refer to any specific medical record or other evidence. The affidavit does state that Crossroads does not keep Lorazepam in its formulary. (Doc. 58 at 3.) Molnar further states that Schrier was put on a taper plan at Montana State Prison and "this plan was continued during his time" at Crossroads. (*Id.*) Schrier was "experiencing delusions, believing that other inmates and/or the facility was pumping nerve gas into his cell and/or poisoning his food."

10

(*Id.* at 4.) On December 27, 2021, Schrier was transferred to suicide prevention

housing. (*Id.*) He occasionally refused his medication or his meals, at one point not

eating for more than eight meals. (*Id.*) What is notably absent from Molnar's

affidavit is any specific description of the taper plan at Crossroads or references to

Schrier's medical records showing that he was administered Lorazepam according

to his Montana State Prison taper regime. Molnar's affidavit concludes "Given

Schrier's dependency, he likely would have experienced hallucinations and other

undesirable side effects regardless of when he stopped taking Lorazepam." (*Id.* at

5.)

The first factor in the Ninth Circuit analysis is the existence of a serious

medical need, and the ultimate analysis of these motions for summary judgment

flows from how the serious medical need is construed. Schrier focuses on the

abrupt withdrawal from Lorazepam, leaving him in an abandoned and miserable

state. (*See* Doc. 71.) The deliberate indifference would be to his extreme suffering

during the time of withdrawal.  Defendants characterize Schrier's claim more

generally, as a needed change of medication, with constant monitoring and

alternative medications. Dr. Rees states in his affidavit, in general, "a rapid taper or

even complete stop to Lorazepam is medically appropriate without serious risk to a

patient's health. *Except in rare* cases, withdrawal symptoms are mild and can be

medically managed with other non-habit-forming medication." (Doc. 55 at 5

(emphasis added).) Thus, Defendants deny Schrier had a serious medical need at all, other than to be weaned from Lorazepam.

### a. State Defendants

Schrier's allegations against the State Defendants regarding his medical are that they were negligent in sending him to Crossroads, knowing the treatment he would receive there, and that their ongoing care of him is insufficient because of his anxiety. The negligence claim is a nonstarter. Negligence is not a cognizable claim under § 1983. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106; *see also Jett*, 439 F.3d at 1096. The record establishes that Montana State Prison sent Schrier with his prescriptions and discussed his taper plan with Crossroads medical staff.

As for his ongoing treatment, the record also demonstrates that Schrier has received sufficient ongoing care at Montana State Hospital. Schrier has not sufficiently disputed the fact that State Defendants have provided adequate care, even if it is not his ideal. The decision not to prescribe him Lorazepam anymore, and to use alternative medications, is a medical decision that State Defendants have credibly and sufficiently supported. State Defendants are entitled to summary

12

judgment on the issue of Schrier's medical care.

### b. Crossroads

The story regarding Schrier's care at Crossroads is different. The serious need to which Defendants either were or were not deliberately indifferent was the acute phase of Schrier's withdrawal from Lorazepam, during his time at Crossroads. As an initial matter, Defendants have failed to point to evidence in the record that shows Schrier was administered Lorazepam in accordance with the previously established plan. The record itself is ambiguous about how much Lorazepam Schrier actually received at Crossroads, and what the taper plan was compared to what it was at Montana State Prison.

The medicine administration charts attached to the Rees affidavit show that, in the period leading up to December 7, when he was transferred, Schrier was receiving 5.5 mg per day at Montana State Prison, in three doses. (Doc. 55-1 at 17 – 18.) The records are not easy to understand, yet Defendants did not refer to them specifically to clarify what they mean. On the day of his transfer, December 7, he received his morning 2 mg dose. (*Id.* at 18.)

There are no analogous drug administration logs from Crossroads. There are approximately 250 pages of medical records from Crossroads, though they are partially interspersed with Montana State Prison records. (Doc. 55-1 at 304 - 551.) The Medical Observation Notes state that, immediately upon transfer, he is being

kept in Medical "while he is tapered off medication that [he] was able to receive at [Montana State Prison]." (*Id.* at 551.) The documents, which are filed in reverse chronological order, reflect that he was prescribed other medication but there is no mention of Lorazepam. (*See, e.g.*, *id.* at 548 (referring to an increase in other medications on 12/8, but no mention of administering Lorazepam, within two days of him receiving a regular dose of 5.5 mg).) One note mentions that the nurse stated, "it is hard on his body to 'cold turkey' from his Ativan," and that the providers are "willing and hopeful to work on his medication needs." (*Id.* at 541 - 542.) A note from ten days later, on Dec. 17, is the first note that mentions a dose of Lorazepam, though it does not mention how much was given. (*Id.* at 525.) In later progress notes from December 30, Lorazepam is ordered at 1 mg/day, reduced from 2 mg/day. (*Id.* at 333.)

The Medical Observation Notes show an escalating situation of distress from Schrier, including lying on the floor, waving his arms, agitation, kicking his door, not eating, rocking back and forth, smearing feces in his cell, incontinence, and periods of being non-verbal alternating with times he claimed to be dying. After a week or ten days in the medical unit, his behavior appeared less extreme, but was still agitated, and he was refusing food. (*Id.* at 515.) By December 22, the notes assess him as "health seeking behavior," and noted that he asked for Lorazepam and claimed, "this place is trying to kill me." (*Id.* at 510.)

14

In a note likely from December 25, because it is filed between two other December 25 notes, Schrier had a security incident in which he threatened to kill himself and had some broken items to use as weapons. Warden Bludworth was at this incident, and it resolved with Schrier in a suicide smock and other suicide precautions in place. (*Id.* at 500.) He is then seen splashing toilet water on his face, lying naked by the toilet. (*Id.* at 499.) He is noted in the following days of urinating on the floor, complaining about being freezing, and asking about "the gas." A few days later he is back in regular clothes and the heat has been turned up, but he is still occasionally disruptive. (*Id.* at 493.) Schrier mostly refused food during this period, around December 31. (*Id.* at 484.) On January 1, 2022, Schrier stated that the cops had been there twice already, and they were coming back for him. (*Id.* at 481 ("Level of orientation difficult to assess. Converses appropriately but in next breath will insist that the local police are looking for him.").)

By January 4, Schrier was noted to "no longer [be] on Lorazepam." (*Id.* at 474; *see also id.* at 330.) On this day, he was transferred out of the medical unit into a restricted housing unit. On that same day, in a Clinic Note, Schrier complained that staff were pumping gas into his cell and trying to kill him. (Doc. 55-1.) On February 1, 2022, Schrier's concern about his food being poisoned is noted in a Clinic Note. (*Id.* at 322.) By March, he was speaking historically about his horrible experience in the medical unit when the warden put gas in his vents

and poisoned his food. (*Id.* at 388.)

This incomplete summary of aspects of Schrier's medical record demonstrates that Schrier was in a profoundly delusional state through December and January at Crossroads. It appears—though this is never clearly laid out in Defendants' filings—that Schrier was immediately reduced from 5.5 mg/day to 2 mg/day upon arrival at Crossroads, and that these doses were inconsistently administered, at times due to Schrier's own refusal to take medication. His affidavit to his Complaint and his ongoing discussions at Montana State Prison and at Crossroads after he was fully detoxed from Lorazepam suggest that he was in a hallucinatory and despondent condition, which caused him to refuse to eat and to act erratically. (Doc. 71-1 at 30.)

Crossroads Defendants have not carried their burden to demonstrate that there are no material factual disputes regarding their administration of Schrier's medication or their care for him during December 2021 and January 2022. Though they posit the medical opinion that Schrier's hallucinations were not life-threatening, and that he may have had hallucinations no matter what, they do not carry their burden to establish without dispute that they were not indifferent to his needs. *Kenney v. Paderes*, 217 F. Supp. 2d 1095 (D. Haw. 2002), *amended on reconsideration in part* (Aug. 21, 2002). Crossroads Defendants' motion for summary judgment is denied.

### 2. Supervisory Liability and Good Faith

Because State Defendants have been granted summary judgment on the issue of Schrier's medical care, their further arguments regarding Warden Salmonsen need not be considered. As to Warden Bludworth, Defendants are correct that he is not liable based on respondeat superior alone. (Doc. 53 at 20.) However, the record shows that Bludworth was personally aware of Schrier's condition and had visited him in the medical unit more than once. (*Id.* at 22.) Defendants construe this fact as showing his concern for Schrier. Bludworth asserts that he "is not in a position to make medical decisions or recommend treatment for inmates at [Crossroads]…and relies on the professional medical judgment of the healthcare providers … to make competent decisions regarding inmate healthcare, and is not involved in the development, recommendation, or adoption of inmate treatment plans." (Doc. 54 at 16.) Lack of medical expertise aside, if Schrier was in visible distress and a state of heightened delusion, Bludworth's awareness without action could show disregard for his suffering. Whether Bludworth had some obligation to behave in any way other than he did is a factual matter that precludes a summary ruling on the basis of supervisory liability or good faith.

### 3. Administrative Remedies

Defendants assert that Schrier never grieved his medical care at Crossroads

and filed only two informal grievances. (Doc. 54 at 8 – 9.) Thus, his suit is barred

by the requirement that he exhaust his administrative remedies. (Doc. 53 at 32.)

The Prison Litigation Reform Act ("PLRA")'s exhaustion requirement states:

> [n]o action shall be brought with respect to prison conditions under
> section 1983 of this title, or any other Federal law, by a prisoner
> confined in any jail, prison, or other correctional facility until such
> administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516, 524-25 (2002);

*Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must "complete the

administrative review process in accordance with the applicable procedural rules,

including deadlines, as a precondition to bringing suit in federal court." *Woodford*

*v. Ngo*, 548 U.S. 81, 93-97 (2006).

Defendants bear the burden of proving failure to exhaust. *See Brown v.*

*Valoff*, 422 F.3d 926, 936 (9th Cir. 2005). If the defendant initially shows that

(1) an available administrative remedy existed and (2) the prisoner failed to

exhaust that remedy, then the burden of production shifts to the plaintiff to bring

forth evidence "showing that there is something in his particular case that made the

existing and generally available administrative remedies effectively unavailable to

him." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014). "The ordinary meaning

of the word 'available' is 'capable of use for the accomplishment of a purpose,'

and that which 'is accessible or may be obtained.'" *Ross v. Blake*, 578 U.S. 632,

642 (2016) (citing *Booth*, 532 U.S. at 737-38.)  Therefore, inmates must exhaust

18

those "grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* (quoting *Booth*, 532 U.S. at 738.) An administrative procedure is not available, and therefore need not be exhausted, "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 643.

Defendants have established that there is a grievance procedure at Crossroads. (Doc. 59.) However, there is a factual dispute over whether Schrier's use of it is exempted from the exhaustion requirement. Schrier claims to have attempted to exhaust his remedies in Crossroads, but he did not have access to the proper forms in the medical unit. He claims to have filed many kites related to his care while in the medical unit, but these are the documents that Crossroads Defendants claim not to retain. He also states that if the "hell" he went through was merely hallucinations, as alleged by Defendants, then how could he be expected to complete the administrative process. (Doc. 71 at 4.) Given the state of mental distress Schrier was experiencing, the grievance procedure was effectively unavailable to him. In this narrow instance, when Schrier appeared to be suffering delusions and hallucinations, his failure to grievance his treatment within five days of its occurrence is excused.

**4. ADA Claim**

19

Defendants contend that Schrier's ADA claim is foreclosed by the terms of the statute, which does not name private correctional facilities as subject to its mandate. (Doc. 53 at 35.) *See* 42 U.S.C. §§ 12101, *et seq*. There is some legal support in other circuits for this proposition, though Defendants do not cite any case law in support of their position.

The Supreme Court has previously held that term "public entity" includes state prisons, and thus, if Schrier had a claim, he could state it against Montana State Prison. *See Penn. Dep't of Corrections v. Yeskey,* 524 U.S. 206, 210 (1998). However, though "[s]tate prisons fall squarely within the statutory definition of 'public entity'," the Supreme Court did not address whether the statute should be construed to include a private entity who contractually manages a correctional facility on behalf of a state. *Id.* Thus, Crossroads Defendants may not be liable on a private ADA claim. Regardless, Schrier has not sufficiently alleged an ADA claim. In order to state a claim under Title II of the ADA, Schrier must allege: (1) he is an "individual with a disability;" (2) he is "otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities;" (3) he was "either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity;" and (4) "such exclusion, denial of benefits, or discrimination was by reason of [his] disability." *McGary v. City of Portland*, 386 F.3d 1259,

1265 (9th Cir. 2004). Schrier fails to allege any of these elements. In fact, in his filings he repeatedly claims he is not mentally ill, and thus, a claim that he was discriminated against based on mental illness fails. But even if he had established he was mentally ill, he does not identify which programs or benefits he was excluded from, or that that exclusion was based on his illness. Defendants are entitled to summary judgment on Schrier's ADA claim.

### IV. CONCLUSION

Neither Schrier nor the Crossroads Defendants have successfully demonstrated that there are no genuine material factual disputes regarding his treatment during his time at Crossroads. Thus, summary judgment is not appropriate on that aspect of Schrier's claim.

Accordingly, IT IS ORDERED that:

1. Plaintiff's motion to compel is DENIED. (Doc. 68.)

2. Plaintiff's motion for summary judgment is DENIED. (Doc. 49.)

3. Defendants' joint motion for summary judgment is GRANTED as to State Defendants and DENIED as to Crossroads Defendants, as explained above, as to Schrier's medical care at Crossroads. Defendants' motion for summary judgment is GRANTED as to Schrier's ADA claim.

4. A schedule governing the remaining proceedings in this case will be established by separate Order.

5.  Schrier must immediately advise the Court and opposing counsel of any change of address and its effective date.  Failure to do so may result in the dismissal of the action for failure to prosecute pursuant to Fed. R. Civ. P. 41(b).

DATED this ___9th___ day of July, 2024.

_____
Donald W. Molloy, District Judge
United States District Court

22